UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.                                                      )<br>)<br>CHUKWUEMEKA EZE,                )<br>)<br>Defendant.                              )<br>) | Criminal No. 19-CR-10354 (LTS) |

**SENTENCING MEMORANDUM OF THE UNITED STATES**

Fraud through Business Email Compromise ("BEC") is a serious and growing problem. Not only has BEC fraud loss exposure doubled worldwide between May 2018 and July 2019, victim reporting reveals that BEC has become a $26 billion threat to the economy.[1] In 2018, despite a prior Massachusetts conviction and jail sentence for fraud, and despite the prospect of having to complete a suspended portion of that sentence, Defendant Chukwuemeka Eze became a part of BEC's explosive growth when he opened bank accounts in victims' names to receive and launder as much as he could of $1.4 million that others had stolen from a Korean manufacturer.

On November 7, 2019, Defendant pleaded guilty to a six-count Information charging him with bank fraud in violation of 18 U.S.C. § 1344 (Count 1), concealment money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i) (Counts 2 through 5), and aggravated identity theft in

---

[1] Federal Bureau of Investigation Public Service Announcement, *Business Email Compromise—The $26 Billion Scam*, https://www.ic3.gov/media/2019/190910.aspx (visited Jan. 28, 2020) (more than 166,000 victims and $26 billion in worldwide fraud loss exposure reported to the FBI and its international partners between 2016 and 2019).

1

violation of 18 U.S.C. § 1028A(a)(1) (Count 6).  In its Presentence Investigation Report ("PSR"), the Probation Office correctly assigns Defendant a Total Offense Level of 26 in Criminal History Category III.  The corresponding Guidelines sentencing range is 78 to 97 months on Counts 1 through 5, with a mandatory consecutive sentence of 24 months on Count 6. (PSR ¶¶ 78-79).

For the reasons stated below, and consistent with its obligations in a plea agreement with Defendant (Docket No. 38), the United States requests that the Court sentence Defendant to concurrent terms of 78 months' imprisonment on Counts 1 through 5, followed by the 24 months that Congress requires under 18 U.S.C. § 1028A on Count 6, for a total of 102 months' imprisonment.  Defendant should also be sentenced to 5 years' supervised release on Count 1 and be ordered to pay $862,823.80 in restitution.[2]  The Court has previously ordered forfeiture. (Docket Nos. 40 & 43).

## THE OFFENSE

Between February and June 2018, Defendant participated in a scheme to defraud the Korean manufacturer, Company A, and to launder the proceeds of that crime.  (PSR ¶ 8). Defendant set himself up on the receiving end of the fraud scheme by using Victim 1's name to incorporate a non-existent company, Levistronix GMB Ltd, and to open a corresponding Massachusetts bank account in that shell company's name.  (PSR ¶¶ 13-14).  Defendant chose Levistronix's name to be deceptively similar to the name of one of Company A's actual suppliers, Levitronix GmbH ("Levitronix").  In May 2018, when co-conspirators presented Company A with five fake Levitronix invoices, along with wiring instructions to send more than

---

[2] Concurrent terms of supervised release on Counts 2 through 5 (money laundering) and Count 6 (aggravated identity theft) should not exceed 3 years and 1 year, respectively.

$1.4 million to Levistronix in Massachusetts, Defendant was there to claim the proceeds.  (PSR ¶¶ 17-18).

As soon as the money arrived, Defendant, posing as Victim 1, withdrew as much of it as he could—by transfer, by cash withdrawal, and by purchasing jewelry, accessories, and dozens of Apple devices and computers.  (PSR ¶¶ 20-21).  Defendant also impersonated Victim 1 to purchase $700,000 in cashier's checks, which he deposited into bank accounts that he had opened in the names of other non-existent companies, using other victims' names and means of identification.  (PSR ¶¶ 23-24).  More withdrawals, transfers, and retail purchases followed. (PSR ¶ 25).  While Defendant claims that "the majority of the funds at issue were transferred to the other participants in the scheme," (Def.'s Objs. to the PSR, Obj. #2), he converted almost all of Company A's money to cash and merchandise as or before it left the accounts he controlled, making it difficult to determine what proceeds Defendant kept and what he passed on.

*Relevant Conduct*

Defendant's involvement in financial frauds did not stop with the Levistronix scam.  In August and September 2018, he used fake names and shell company bank accounts to receive other criminal proceeds, including more than C$548,000 (or US$411,000) in fake checks that purported to be drawn on a Canadian company's bank account.  (PSR ¶¶ 27-30).  In June 2019, when agents arrested Defendant at his Lynn home, he had there passports, visas, and driver's licenses bearing his likeness and other peoples' names.  (Docket No. 19, Order on Government's Motion for Detention (Boal, J)).

THE REQUESTED SENTENCE

A low-end Guidelines sentence of 78 months (plus 24 months consecutive on Count 6) is without doubt a significant sentence, especially for a defendant who has previously served only

15 months in custody. But the factors that appear in 18 U.S.C. § 3553(a) call for a significant sentence in Defendant's case.

*Specific Deterrence – 18 U.S.C. § 3553(a)(2)(B)*

Before February 2015, Defendant appears to have been living the classic American story. After experiencing adversity abroad, he immigrated here; started a family; learned new skills; worked hard in challenging and rewarding jobs; became a citizen; and purchased a home, all while sending what money he could to the family he left behind. (PSR ¶¶ 57, 61-63, 69, 72 & Docket No. 44-1). But for reasons that are not clear, he left that path in February 2015 when he made $42,810 in unauthorized charges on a Virginia man's American Express card. A judge sentenced Defendant to 30 months' imprisonment, suspending 15 months of that sentence, and placed Defendant on two years' probation. (PSR ¶ 49).

Neither the fifteen months he spent in custody, however, nor the prospect of completing the unserved portion of his 30-month sentence, were enough to guide Defendant back toward a law-abiding life. To the contrary, his fraudulent schemes only expanded in their size, scope, and complexity.

Within seven months of his June 2017 release from custody, Defendant took the first steps in the scheme charged in the Information. (PSR ¶ 12). This conduct was not aberrant. It continued past the $1.4 million invoice fraud, through the $400,000 check fraud scheme in the summer of 2018, and right up until his arrest with a library of fake passports and driver's licenses in June 2019. In short, Defendant's arrest, not a charge of heart, halted his criminal activity.

To the extent financial and family challenges pulled Defendant away from honest work in 2015, and again in 2018, these pressures will remain upon his release, perhaps even more so as he embarks on life with a second felony conviction. The United States requests a significant

sentence to reflect the failure of his prior conviction and split sentence to deter Defendant; to prevent him from reoffending while in custody; and to hold out the possibility of even more significant punishment should he commit new crimes. While there is no mathematical equation that can assure that Defendant will not re-offend, a substantial increase over the jail terms he ignored is needed to reinforce the Court's expected order that he never return to fraud.

*General Deterrence—18 U.S.C. § 3553(a)(2)(B)*

The requested sentence is also necessary to deter others from engaging in fraudulent schemes like Defendant's. There is no evidence that Defendant conceived of the invoice fraud, or even the check fraud scheme that followed, but these schemes do not work without someone like Defendant who is willing to take the money out of the banking system. And while relatively few criminals possess the requisite skill to hack email accounts, forge invoices, and circumvent accounting controls, anyone can be tempted to make unauthorized withdrawals for a quick 10- to 40-percent commission. The United States intends for the requested sentence to raise the relatively low barrier to entry to money laundering crimes, and also—given the magnitude of the BEC crisis described above—to reflect the fact that it can identify and prosecute only a small fraction of participants in BEC schemes. Those considering following Chukwuemeka Eze's example must see that the consequences of his crimes were significant. *See United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool and calculated th[a]n sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence") (internal quotation omitted)).

*Seriousness of the Offense—18 U.S.C. § 3553(a)(2)(A)*

Defendant's conviction is unquestionably a serious one. Although dollar amounts are not the only measure of a crime, the $1.4 million that Defendant and his coconspirators stole or

attempted to steal from Company A is more than 33 times what Defendant took from American Express in 2015. Even accepting for purposes of argument Defendant's suggestion that the Guidelines punish him too severely for intended but unrealized loss, the $862,823.80 that the victims did lose is 20 times the actual loss that resulted from Defendant's first conviction. It does not follow, of course, that Defendant should be sentenced 20 times as harshly, but he should face a significantly more serious punishment than he received for his first offense.[3]

Factors other than money or profit also show the seriousness of Defendant's crime. Identity theft, in particular, follows its victims over not months but years. Victim 1, the Texas resident whose name was used to incorporate Levitronix, told the FBI that his identity was first taken approximately 10 years ago. He has no idea whether this latest use of his name and identifiers was new, or simply a residual effect of the earlier theft. Victim 1's experience is not unusual, and it can be unsettling to have one's personal information in effect permanently exposed. The Consumer Sentinel Network, maintained by the Federal Trade Commission,

---

[3] Defendant suggests he distributed most of the money to other participants. As noted above, it is difficult to determine exactly how much cash and merchandise Defendant kept. Photos taken on Defendant's phone between June and September 2018—at the height of his involvement in the scheme—show significant renovations to the kitchen, entry, and porch of his Lynn home—work that does not appear to square with the financial picture that Defendant presents.




received 444,602 identity theft complaints in 2018 alone. *See* https://www.ftc.gov/system/files/documents/reports/consumer-sentinel-network-data-book-2018/consumer_sentinel_network_data_book_2018_0.pdf (visited Jan. 30, 2020). Congress has recognized the serious problem that identity theft poses, separate and apart from underlying frauds, by requiring the imposition of a 24-month mandatory minimum sentence consecutive to the sentence that the Court imposes on Defendant's fraud and money laundering convictions.

Defendant's money laundering to conceal the origin of Company A's money is also serious because it compromises the integrity of the banking and payments systems. In investigating the scheme, the FBI unraveled several layers of corporate shell accounts, and Defendant controlled most of them. (PSR ¶¶ 23-25). This kind of deception not only imposes costs on banks that have to implement anti-fraud measures, but also on the millions of customers engaging in legitimate transactions who have to spend time proving that they are in fact who they say they are. What businesses spend on security against Business Email Compromise is not spent on their missions. The Court's sentence should reflect these systemic injuries as well.

*Guidelines—18 U.S.C. § 3553(a)(4)*

The United States respectfully disagrees with Defendant's suggestion that the Guidelines fail to "measure the case or the man…appropriately." (Docket No. 44 at 2). The PSR's Guidelines enhancements do far more than convert a dollar loss into an advisory sentencing range. Rather, they reflect policies about the seriousness and sophistication of Defendant's conduct. Sixteen levels do flow from the loss amount, but two stem from Defendant's use of corporate shells; another two from his use of fake identifications; and two more from the fact that he also laundered money as. His consecutive sentence flows from his aggravated identity theft conviction. Defendant's Criminal History Category and his commission of his offense while on

probation also increase the advisory GSR. If loss and Base Offense Level were to be considered alone, Defendant would be facing a GSR of 33 to 41 months. But as noted above, Defendant's offense is about more than what he and his co-conspirators took.

*Nature and Circumstances of the Offense and the History and Characteristics of the Defendant — 18 U.S.C. § 3553(a)(1)*

Defendant's personal story will exert the strongest downward pull on whatever sentence the Court imposes. The sentence will assuredly impact Defendant's fiancé and their three children, both financially and emotionally. His friends and family describe him in their letters as a man with many worthy traits: a dutiful son, parent, sibling, and friend; a hard worker; and a good person with a good heart. His willingness to accept responsibility for his actions through a prompt plea and his first steps toward self-improvement at Wyatt Detention Center (PSR ¶ 67) also suggest a defendant who can be rehabilitated.

This history and these characteristics counsel some leniency, but they are not present to a degree that materially distinguishes Defendant from others who appear before the Court to be sentenced. Perhaps more importantly, they should carry far less weight at a sentencing for a second offense. Defendant's first conviction should have reminded him of his responsibilities to his family and community, and it is regrettable that he appears to have given them less thought the second time around. At bottom, the United States fears that Defendant's request—based largely on his history and characteristics—for a 12-month sentence on Counts 1 through 5 (followed by the required 24 months on Count 6) strikes the wrong balance with the other section 3553(a) factors described in the parties' memoranda.

## CONCLUSION

For all of the reasons stated above, the United States asks the Court to sentence Defendant to 78 months in custody on Counts 1 through 5, to be followed by 24 consecutive months' imprisonment on Count 6; to pay $862,823.80 in restitution and the required $600 special assessment; and that the Court incorporate its previous forfeiture orders into the final judgment. The United States requests that the Court not impose a fine to ensure that any money that Defendant can pay is directed to the victims in the case.

Respectfully submitted,

ANDREW E. LELLING
UNITED STATES ATTORNEY


BY:/s/Seth B. Kosto
SETH B. KOSTO
Assistant United States Attorney
One Courthouse Way
Boston, Massachusetts 02210
(617) 748-3230

January 31, 2020
Boston, Massachusetts

CERTIFICATE OF SERVICE

I hereby certify that I have caused a true copy of the Sentencing Memorandum of the United States on counsel for the defendant, Eric Paul Christofferson, Esq. and Jennifer Brown, Esq., via the ECF system.

/s/Seth B. Kosto
SETH B. KOSTO
Assistant United States Attorney

January 31, 2020
Boston, Massachusetts